Chestnut v United Methodist Church (2024 NY Slip Op 03726)

Chestnut v United Methodist Church

2024 NY Slip Op 03726

Decided on July 10, 2024

Appellate Division, Second Department

Wan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on July 10, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

COLLEEN D. DUFFY, J.P.
PAUL WOOTEN
DEBORAH A. DOWLING
LILLIAN WAN, JJ.

2023-08081
 (Index No. 900084/21)

[*1]Kristian Chestnut, respondent, 
v
United Methodist Church, et al., appellants, et al., defendants.

APPEAL by the defendants United Methodist Church and General Council on Finance and Administration of the United Methodist Church, in an action, inter alia, to recover damages for negligence, from an order of the Supreme Court (Leonard D. Steinman, J.), entered April 14, 2023, in Nassau County. The order, insofar as appealed from, after a hearing, denied that branch of the motion of the defendants United Methodist Church and United Methodist Church General Conference which was pursuant to CPLR 3211(a)(8) to dismiss the amended complaint insofar as asserted against the defendant United Methodist Church, and denied the motion of the defendant General Council on Finance and Administration of the United Methodist Church pursuant to CPLR 3211(a) to dismiss the amended complaint insofar as asserted against it.

Schahill Law Group, P.C., Bethpage, NY (Keri A. Wehrheim of counsel), for appellants.
McAllister Olivarius, New York, NY (John Francis McAllister and Meghna Sridhar of counsel), for respondent.

WAN, J.

OPINION & ORDER
On this appeal, we consider whether the defendant United Methodist Church is a jural entity amenable to suit and whether the defendant General Council on Finance and Administration of the United Methodist Church (hereinafter GCFA) was timely added as a defendant in this action. For the reasons that follow, we determine that, on the record before this Court, United Methodist Church established that it is not a jural entity that is capable of being sued as an unincorporated association. We also determine that GCFA was timely added as a defendant. Therefore, we modify the order entered April 14, 2023.
Factual and Procedural Background
On July 5, 2021, the plaintiff commenced this action pursuant to the Child Victims Act (see CPLR 214-g; hereinafter the CVA) against the defendants United Methodist Church General Conference (hereinafter the General Conference), United Methodist Church Northeastern Jurisdiction New York-Connecticut District, New York Annual Conference of the United Methodist Church, United Methodist Church Long Island East District, Long Island East District of the New York Annual Conference of the United Methodist Church, and United Methodist Church of Woodbury New York. The complaint also named an entity denominated United Methodist Church as a defendant. The complaint alleged, inter alia, that United Methodist Church "is a not-for profit religious association and/or organization conducting business in the State of New York and organized and existing under the laws of the State of New York with its principal place of business located at c/o GFCA, 1 Music Circle North Nashville, Tennessee 37203." The complaint further [*2]alleged that an individual, who was employed by the defendants and assigned to United Methodist Church of Woodbury New York as a youth group leader and was also the son of a clergyman assigned there, sexually abused the plaintiff. The abuse allegedly occurred "[f]rom approximately 1983 to 1986, when [the] [p]laintiff was approximately four (4) to seven (7) years old." The complaint alleged that United Methodist Church, "as principal," was in an agency relationship with United Methodist Church of Woodbury New York and a "special relationship of employer-employee" with the alleged abuser.
Thereafter, United Methodist Church and the General Conference, by GCFA, moved pursuant to CPLR 3211(a)(8) to dismiss the complaint insofar as asserted against them on the basis that neither entity is a jural entity capable of being sued and for failure to effect proper service of process. As relevant here, in support of that branch of the motion which was to dismiss the complaint insofar as asserted against United Methodist Church, United Methodist Church and the General Conference submitted, among other things, an affidavit of Bryan Mills, general counsel for GCFA. Mills averred that "[t]he structure of The United Methodist Church, in the form of a Constitution and ecclesiastical laws, is collected and codified in a book of laws known as The Book of Discipline of The United Methodist Church" (hereinafter the Discipline), which is defined as "'the instrument for setting forth the laws, plan, polity, and process by which United Methodists govern themselves.'" Mills averred that pursuant to paragraph 2509 of the Discipline, denominated "Instituting and Defending Civil Action,"
"'[b]ecause of the nature of The United Methodist Church . . . , no individual or affiliated church body or unit, nor any official thereof, may commence or participate in any suit or proceeding in the name of or on behalf of The United Methodist Church, excepting, however, the following: [GCFA] or any person or church unit served with legal process in the name of The United Methodist Church may appear for the purpose of presenting to the court the nonjural nature of The United Methodist Church and to raise issues of lack of jurisdiction of the court, lack of capacity of such individual or unit to be served with process, and related constitutional issues in defense of denominational interests'" (emphasis omitted).
Mills further averred that United Methodist Church
"is a religious denomination, not a legal entity. It is forbidden by the precepts of its own religious tenets and its controlling documents, including [the Discipline], from holding property and, in fact, does not own property. The United Methodist Church does not have any employees, officers, or directors. It does not have an office or mailing address."
Instead, Mills averred that United Methodist Church is "'connectional'" in nature. As such, paragraph 141 of the Discipline
"sets forth that The United Methodist Church is not a legal entity. It is not incorporated or otherwise organized under the laws of any State or any other jurisdiction, including New York. The denomination operates only through its units, which include conferences, national and world-wide councils, boards, agencies, and local churches. Those units are, for the most part, legal entities that are capable of suing and being sued and possessed of legal capacities; they have employees, agents, boards of directors or trustees, offices and business locations."[FN1]
Mills further averred that "[i]t is equally forbidden, by its own religious tenets, for The United Methodist Church to commence litigation." Paragraph 2509 of the Discipline states that "[b]ecause of the nature of The United Methodist Church . . . , no individual or affiliated church body or unit, nor any official thereof, may commence or participate in any suit or proceeding in the name of or on behalf of The United Methodist Church," except, as noted above, "for the purpose of presenting to the court the nonjural nature of The United Methodist Church and to raise issues," including "lack of jurisdiction of the court."[FN2]
In opposition, the plaintiff contended that United Methodist Church's assertion that it is not a jural entity "is one of semantics that is belied by [United Methodist Church's] own public statements." The plaintiff argued that "[United Methodist Church] is a large organization that had revenue close to $200 million in 2018" and "transacts its business as a religious corporation or a not-for-profit but does not want to label itself as such." The plaintiff referred to a flow chart entitled "PlanUMC," which showed the "General Conference of the United Methodist Church" as the top-most entity in the United Methodist Church hierarchy. The plaintiff also noted that on "the [United Methodist Church] website under Home/Who We Are/Agencies," the General Conference is described as follows:
"'[The] General Conference establishes general agencies (or churchwide agencies) to provide essential services and ministries beyond the scope of individual local congregations and annual conferences, and they are important for providing a common vision, mission and ministry for the entire global church. [The] General . . . Conference and the Connectional Table share in oversight of agency programs and ministries.'"
The plaintiff also submitted a document entitled "The General Funds of The United Methodist Church: Financial Statements and Supplemental Schedules As of and for the Years Ended December 31, 2018 and 2017 And Report of Independent Auditor" (hereinafter the Audit Report). The Audit Report, which is addressed to GCFA's Board of Directors and Committee on Audit and Review, stated, among other things, that
"The General Funds of The United Methodist Church (the "General Funds") have been established by the General Conference, the central legislative body of The United Methodist Church, to make possible the programmatic and administrative work of The United Methodist [*3]Church's ministry and mission on a national and international level and have been specifically authorized to be raised on a church-wide basis. . . . General church funds are granted by the General Funds only for the purpose or purposes set forth in the budgets or similar directives adopted for the respective funds by the General Conference and do not include funds held by local churches, annual or jurisdictional conferences, or other units of the denomination."
The Audit Report also showed for 2018 total revenue and support for the General Funds of $191,064,059, with $49,034,777 of that revenue subject to "donor restrictions," as well as $10,919,656 in employee salaries and approximately $3 million in employee benefits. As argued by the plaintiff, "[t]he concept that an organization has revenue of $190 million and spends just as much is not subject to legal process, is a fiction."
The plaintiff also highlighted sections of the "United Methodist Church Global Terms of Service" found on the website www.umc.org:
"Who are we?
"These terms apply to your access to and use of all sites operated by or on behalf of The United Methodist Church and official United Methodist Church entities worldwide, including its governing bodies, conferences, districts, agencies, local churches, ministries, institutions, offices, programs, and other official related organizations, to the extent the sites post or link to these terms.
"Your agreement with us
". . . These terms create a legal binding agreement between you and us and describe the rules of your use of our sites, including our websites, mobile applications, micro-sites, social media platforms, and other online and digital properties, content, products, services, software and applications.
. . .
"Intellectual property
"Unless otherwise noted, all content on our sites is subject to intellectual-property rights, including copyrights and trademarks, held or licensed by us.
. . .
"Governing law
" . . . Except for disputes subject to arbitration as stated below, the state and federal courts of Davidson County, Tennessee, shall be the exclusive forum and venue to resolve disputes."
Based upon these excerpts, the plaintiff contended that since "'us' is never defined as something other than the United Methodist Church[,] . . . it would be illogical to conclude [United Methodist Church] is not [a] jural entity."
The plaintiff also contended that the "conflation between [United Methodist Church] and [the General Conference] and how they are policy maker[s] for the local churches is seen in a recent press release touting a settlement of Boy Scout sexual abuse claims." That press release, entitled "United Methodists reach settlement in Boy Scouts' Bankruptcy Case," states, among other things, that "United Methodist leaders have reached a settlement in the matter of the Boy Scouts of America's (BSA) pending bankruptcy proceedings," and that "The United Methodist Church has [*4]long worked proactively to prevent child abuse." The plaintiff further noted a statement on the United Methodist Church website concerning the BSA bankruptcy proceeding that indicated that "'[t]he Ad Hoc Committee recommends that churches who filed a proof of claim vote "yes" on the plan and for those who previously voted "no," the Ad Hoc Committee recommends congregations change their vote to "yes."'" Such communications, the plaintiff argued, demonstrate that United Methodist Church and/or the General Conference "are directing local Methodist churches in what the local church policy should be toward child sexual abuse."
As such, the plaintiff asked the Supreme Court to deny the motion of United Methodist Church and the General Conference or, in the alternative, to permit the plaintiff discovery on "entity, organizational structure, and the command-and-control structure of the moving parties that [the] [p]laintiff has [pled] are the national/international organizations that run the United Methodist Church."
In reply, United Methodist Church and the General Conference, submitted, among other things, a reply affidavit of Mills, in which he averred that the "PlanUMC" chart was published by "United Methodist Insight," which was not an official United Methodist organization, and that the chart did not represent the polity of United Methodist Church, but rather a proposal to restructure United Methodist Church's general agencies, which proposal was passed by the General Conference in 2012 but later struck down by the United Methodist Church Judicial Council as "unconstitutional under the precepts of United Methodist beliefs." Mills also noted that in the BSA bankruptcy proceeding, the United Methodist Ad Hoc Committee, which is not a party to this action, had submitted a verified statement in which it stated, inter alia, that
"[u]nlike some other denominations, the United Methodist Church is 'connectional' and is thus not centrally controlled or organized. For example, each United Methodist local church owns its assets (in trust on behalf of the denomination) and generally controls its own affairs, subject to the rules established in [the Discipline]. Consequently, neither the Committee nor any Annual Conference can control or bind any United Methodist local church."
On November 2, 2021, the plaintiff filed an amended complaint, naming GCFA as an additional defendant. Thereafter, GCFA moved pursuant to CPLR 3211(a)(5) and (8) to dismiss the amended complaint insofar as asserted against it as time-barred under CPLR 214-g and for failure to effect proper service of process.
In an order dated July 13, 2022, the Supreme Court, inter alia, directed that an evidentiary hearing be held on the issues of whether United Methodist Church and the General Conference are nonjural entities and whether service was properly effectuated on United Methodist Church, the General Conference, and GCFA (hereinafter collectively the defendants).
The Hearing
At the hearing, the defendants called, among others, attorney Evelynn Caterson as a witness. Caterson explained that she "was born a Methodist" and has been "involved in many committees, and . . . leadership positions in [her local] church." She has also "accepted leadership positions at the Annual Conference level." After graduating from law school, she "began representing local churches on their various issues in the conferences where [she] was located." She served for eight years on the Judicial Council, "which is the Supreme Court of the world's United Methodist Church." After her term on the Judicial Council, she was elected as a delegate to the General Conference in 2004, 2008, 2012, and 2016, and to the Special Conference in 2019. In 2009, she was elected as "chancellor or attorney for [her] local Annual Conference." She testified,
"In the course of my various duties, I have been asked in New Jersey court cases for an understanding of The Methodist system. And I guess word has gotten out that I have a good understanding, especially with eight years on the Supreme Court, of the polity of The United Methodist Church."
When asked to describe the Methodist polity, i.e., "[t]he structure and operation of the Methodist system," Caterson testified:
"The United Methodist Church is a world-wide name given to the system of United Methodism. People from all over the world who [*5]have claimed to be United Methodists are part of this huge system. This huge system is operated under a Book of Law called the Book of Discipline. The Book of Discipline began in the late 1700s. And every four years there is a convention, called a General Conference. It is now a two week convention where delegates are permitted to accept and vote on changes or modifications or deletions to this Book of Law. So the Book of Law currently we are operating under is the 2016 Book of Discipline, because the 2020 General Convention never happened because of the pandemic.
"Under the General Church functioning, there are a group of 10, 12 separate corporations. The United Methodist Church is not an entity, it is not incorporated. It has no location, has no assets, has no records. It is just a system. But as part of the General Church, there are 10 to 12 corporations[, including] GCFA. . . . And there are many more, all listed with their name and responsibility in the Book of Discipline.
"The next level down is that in the United States, the Methodist system is divided into jurisdictions. Again, they are not a legal entity but a geographic description of groupings. We here in the northeast are part of the Northeast Jurisdiction. There is a Northeast Jurisdictional Conference, which is like a convention, which convenes four years after every General Conference. Its purpose is to have its delegate[s] elect bishops for the church.
"Under the jurisdiction, and as I said, we're in the northeast, the Northeast Jurisdiction has ten Annual Conferences. They are incorporated. I believe your area is the New York Annual Conference. I'm part of the Greater New Jersey Annual Conference, and there are eight others. As I said, the Annual Conferences are incorporated and geographically divided into districts. I'm part of the Cape Atlantic District being in southern New Jersey, right outside of Atlantic City.
"In the district there are between 50 and 80 local churches. Again, grouped together geographically. I am part of the Absecon United Methodist Church. [Its] corporate name is United Methodist Church at Absecon. And it, too, is incorporated. . . .
"I do want you to know there is a part of [the] Methodist system, which is called the Judicial Council[,] . . . [which] is like the Supreme Court of the world United Methodist Church."
Caterson clarified that "[t]he General Conference is simply a convention for two weeks every four years" with United Methodists from around the world. Delegates from the United States are elected by each Annual Conference, which chooses from members sent by the local churches to the Annual Convention held by the Annual Conference. In addition to amending and modifying the Discipline, the main purpose of the General Conference "is to worship and celebrate the ministries of the church" and to "learn a lot about the mission," which, according to the Discipline, is "to make disciples for Jesus Christ for the transformation of the world." Additionally, the General Conference elects individuals to the Judicial Council and approves volunteers to be on the board of the dozen or so nonprofit agencies that make up the General Church, including GCFA. Caterson identified the "general funds of the United Methodist Church" as the "funds allocated to the various dozen corporate entities that also serve the General Church," and noted that those funds are held by GCFA. She clarified that the General Conference did not create or generate these funds. Instead, GCFA would assemble a budget "of running the various programs and [*6]corporations of the General Church." The General Conference would then approve the budget, which would be funded by "either the local church or individuals who want to donate." She characterized the budget as "a wish list," since it cannot be "guarantee[d] that everything on a budget is going to be funded." Caterson was unaware of the Audit Report, which was not introduced as an exhibit during the hearing.
Concerning the Annual Conferences, Caterson clarified that "there are resident bishops assigned as the administrator of" them, and since the Annual Conferences are incorporated, they have a board of directors. Caterson clarified that "the local churches are all separately incorporated." When asked about the hiring process for staff and clergy at the local churches, Caterson testified that "hiring is the wrong word." According to Caterson,
"[t]he Annual Conference following [the] Discipline has a list of criteria for someone to be ordained or certified or commissioned. The highest level of clergy doctrination is ordained. So a person who wants to be an ordained elder would follow all the rules of the Discipline. The Annual Conference would say, yes or no, that they have successfully completed all the requirements of the [D]iscipline. And then the bishop of that Annual Conference and his or her appointment cabinet, would appoint the ordained elder to a local church on a year-by-year basis. . . . It's called the itinerant system, whereby the local clergy itinerate or go from local church to local church."
According to Caterson, "[o]nce the clergy is appointed to a church, the supervision of a local church is the responsibility of a local church volunteer organization called . . . the pastor parish relations committee . . . . And that committee is responsible for supervising, supporting, evaluating, and basically taking care of the people employed, including the pastor." The local church is responsible for paying the salary of its staff and clergy, except where the local church is too small to raise enough money for the cost of living, in which case the Annual Conference, "by the giving of other local churches, . . . fills in." The ability to remove the credentials of an ordained elder resides with the Board of Ordained Ministry, which is situated within the Annual Conference. At the same time, "[t]he United Methodist Church is simply a system, it has no role whatsoever in, with a local church clergy. None whatsoever." Similarly, the General Conference "has nothing to do with the local church staffing."
Caterson testified that "[t]he United Methodist Church is a system" and "not an association" of people. "It owns no property, it has no officers, it has no boards. It is just the name of the system," which is a system "of worship, of mission," and "[o]f making disciples of Jesus Christ for the transformation of the world." Caterson denied that United Methodist Church was similar to "a holding company with subsidiaries," and said instead it was "a bunch of separate corporations with responsibilities, each with its own board of trustees." She stated that the Discipline sets forth the responsibilities of those entities that are a part of the Methodist system. The Discipline contains and serves as the bylaws for all United Methodist entities. Concerning property, pursuant to the Discipline, title to local church property "is owned by your local church board of trustees, but is in, held in trust for The United Methodist denomination. And the authority above the local church that is able to hold property that is incorporated would be the Annual Conference." Thus, if a local church were to shut down, local church property "would immediately become the property of the Annual Conference."
Paragraph 2501(1) of the Discipline, entitled "Requirement of the Trust Clause for All Property," reads as follows:
"All properties of United Methodist local churches and other United Methodist agencies and institutions are held, in trust, for the benefit of the entire denomination, and ownership and usage of church property is subject to the Discipline. This trust requirement is an essential element of the historic polity of The United Methodist Church or its predecessor denominations or communions and has been a part of the Discipline since 1797. It reflects the connectional structure of the Church by ensuring that the property will be used solely for purposes consonant with the mission of the entire [*7]denomination as set forth in the Discipline. The trust requirement is thus a fundamental expression of United Methodism whereby local churches and other agencies and institutions within the denomination are both held accountable to and benefit from their connection with the entire worldwide Church.
"In consonance with the legal definition and self-understanding of The United Methodist Church (see ¶ 141), and with particular reference to its lack of capacity to hold title to property, The United Methodist Church is organized as a connectional structure, and titles to all real and personal, tangible and intangible property held at jurisdictional, annual, or district conference levels, or by a local church or charge, or by an agency or institution of the Church, shall be held in trust for The United Methodist Church and subject to the provisions of its Discipline. Titles are not held by The United Methodist Church (see ¶ 807.1) or by the General Conference of The United Methodist Church, but instead by the incorporated conferences, agencies, or organizations of the denomination, or in the case of unincorporated bodies of the denomination, by boards of trustees established for the purpose of holding and administering real and personal, tangible and intangible property."
Order Appealed From
In an order entered April 14, 2023, after the hearing, the Supreme Court, inter alia, denied that branch of the motion of United Methodist Church and the General Conference which was pursuant to CPLR 3211(a)(8) to dismiss the amended complaint insofar as asserted against United Methodist Church. The court determined that "[i]t is clear from the evidence that [United Methodist Church] is subject to suit as an unincorporated association." The court concluded that "[United Methodist Church], through its various constituent entities, dictates policies and procedures that must be followed by local churches and its employees," and that "[t]he Amended Complaint alleges that these policies included instructions and directions related to the hiring, retention and supervision of local church personnel, including plaintiff's alleged abuser." The court also determined that its "conclusion that [United Methodist Church] can be sued does not impermissibly entangle the court with religion," and that United Methodist Church's "internal decision on how to organize itself . . . is not binding upon the courts with respect to whether it may be held legally accountable and [United Methodist Church] cannot unilaterally determine that it is immune from suit." The court "reach[ed] a different conclusion with respect to [the] General Conference's amenability to suit," determining that the General Conference "has no common purpose or enterprise separate and apart from [United Methodist Church]," but is instead "an internal religious body of [United Methodist Church], akin to a legislative board with powers of appointment within [United Methodist Church], or a division of [United Methodist Church]."[FN3]
The Supreme Court also denied GCFA's motion pursuant to CPLR 3211(a) to dismiss the amended complaint insofar as asserted against it.[FN4]
United Methodist Church and GCFA (hereinafter together the appellants) appeal.
Discussion
On appeal, the appellants contend that the Supreme Court should have granted that branch of the motion of United Methodist Church and the General Conference which was pursuant to CPLR 3211(a)(8) to dismiss the amended complaint insofar as asserted against United Methodist Church, since United Methodist Church is not a jural entity capable of being sued. The appellants also contend that "there is another, overarching reason for reversing the denial of" that branch of the motion—"to avoid entangling the Court in making determinations, forbidden by the Establishment Clause of the United States Constitution, which would result in 'excessive government entanglement with religion'" (quoting Lemon v Kurtzman, 403 US 602, 613).
As an initial matter, contrary to the appellants' contention, the Supreme Court properly determined that it could resolve the issue of whether United Methodist Church is a jural entity without violating the First Amendment of the United States Constitution. "The First Amendment forbids civil courts from interfering in or determining religious disputes, because there is a substantial danger that the state will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrines or beliefs" (Matter of Congregation Yetev Lev D'Satmar, Inc. v Kahana, 9 NY3d 282, 286). At the same time, "[c]ivil disputes involving religious parties or institutions may be adjudicated without offending the First Amendment as long as neutral principles of law are the basis for their resolution" (id.; see Drake v Moulton Mem. Baptist Church of Newburgh, 93 AD3d 685, 686). "The neutral principles of law approach requires the court to apply objective, well-established principles of secular law to the issues," and "[i]n doing so, courts may rely upon internal documents, such as a congregation's bylaws, but only if those documents do not require interpretation of ecclesiastical doctrine" (Matter of Congregation Yetev Lev D'Satmar, Inc. v Kahana, 9 NY3d at 286 [internal quotation marks omitted]).
Here, the issue of whether United Methodist Church is a jural entity capable of being sued does not concern a religious controversy, and, therefore, does not require the interpretation or application of ecclesiastical doctrine. Instead, the issue of whether United Methodist Church may be considered an unincorporated association rests entirely on neutral principles of law, to wit, the law of New York concerning whether an entity constitutes a jural entity in the form of an unincorporated association capable of being sued. In that regard, any interpretation of the provisions of the Discipline discussing the structure of United Methodist Church is permissible (see id.).
However, applying neutral principles of law, we determine that on the record before this Court, the defendants established that United Methodist Church is not a jural entity with the capacity to be sued. Dismissal pursuant to CPLR 3211(a)(8) for lack of personal jurisdiction is warranted where a named defendant is not a legal entity amenable to suit (see Honeyman v Curiosity Works, Inc., 120 AD3d 1302, 1303; Holtzman v KTB Athletics SB TM, 113 AD3d 656). New York law recognizes that "[a]n action or special proceeding may be maintained, against the president or treasurer" of an "unincorporated association" "upon any cause of action, for or upon which the plaintiff may maintain such an action or special proceeding, against all the associates, by reason of their interest or ownership, or claim of ownership therein, either jointly or in common, or their liability therefor, either jointly or severally" (General Associations Law § 13; see CPLR 1025 ["Two or more persons conducting a business as a partnership may sue or be sued in the partnership name, and actions may be brought by or against the president or treasurer of an unincorporated association on behalf of the association in accordance with the provisions of the general associations law"]). Although the term "unincorporated association" is not further defined by statute, New York courts have determined that "[i]t is only when a partnership has a President or a Treasurer that it is deemed an association within the meaning of" General Associations Law § 13 (Conklin v Mezzano, 46 NYS2d 281, 282 [Sup Ct, Ulster County]). As such, "[a]n unincorporated association . . . has 'no legal existence separate and apart from its individual members'" (Pascual v Rustic Woods Homeowners Assn., Inc., 134 AD3d 1006, 1006, quoting Vincent C. Alexander, Prac Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C1025:2 at 341).
Additionally, the Court of Appeals has stated that "unincorporated associations" are "voluntary congregate entities" (Community Bd. 7 of Borough of Manhattan v Schaffer, 84 NY2d 148, 155). The Appellate Division, Third Department, expanded on this characterization in Craine v NYSARC, Inc. (88 AD3d 1105, 1105-1107). There, "a group of parents in Chenango County formed a group for the purpose of improving opportunities for the education, care, and vocational training of their developmentally disabled children" and became the Chenango County Chapter [*8](hereinafter the Chapter) of NYSARC, Inc. (hereinafter NYSARC), a not-for-profit corporation (id. at 1105). At some point, NYSARC sought to restructure its corporate makeup, and the Chapter sought NYSARC's approval to incorporate separately (see id. at 1106). When NYSARC refused to approve this plan, the plaintiff, who was the Chapter's president, commenced an action against NYSARC, seeking, inter alia, a judgment declaring that the Chapter is a separate and distinct entity from NYSARC (see id.).
In determining that the Chapter constituted an unincorporated association with a separate legal existence from NYSARC, the Third Department highlighted several "markers of autonomy" attributable to the Chapter (id. at 1107). The court noted that NYSARC "undeniably exercises significant control over the Chapter, which operates under [NYSARC's] oversight and supervision pursuant to [NYSARC's] bylaws, chapter manual . . . , policies, and other documents governing the parties' relationship" (id. at 1106). At the same time, the court noted that
"these documents also grant considerable local autonomy to each chapter. Among other things, the Chapter elects its own officers and board of directors, has its own federal employer identification number, state operating licenses and tax exempt status, files its own fiscal reports and tax returns, maintains its own bank accounts, hires, trains and pays its own employees, and operates its own programs and purchases real property from its own revenues, independent of any financial contribution from [NYSARC]" (id. at 1107 [footnote omitted]).
The court also noted that "other chapters of [NYSARC] have commenced litigation in their own right, including litigation against [NYSARC]" (id.).
Despite the longstanding provisions of the Discipline stating that United Methodist Church is not a jural entity with the capacity to sue or be sued, the issue of United Methodist Church's jural nature and whether it constitutes an unincorporated association capable of being sued has resulted in surprisingly limited decisional law. In Barr v United Methodist Church (90 Cal App 3d 259, 270, 153 Cal Rptr 322, 330), a decision issued in 1979, the Court of Appeal of California, Fourth Appellate District, Division One, determined that United Methodist Church was amenable to suit as an unincorporated association since, among other reasons, it "is a highly organized religious body working through specific agencies to accomplish laudable goals." More recently, a federal district court in Michigan granted United Methodist Church's motion to dismiss the complaint insofar as asserted against it "because it is a religious denomination, not a legal entity" (Myerscough v United Methodist Church, 2023 WL 3995847, *1, 2023 US Dist LEXIS 103582, *2 [WD Mich, No. 2:22-cv-226]). However, it appears that the plaintiff in that case did not oppose United Methodist Church's motion to dismiss (see Myerscough v United Methodist Church, 2023 WL 3998256, 2023 US Dist LEXIS 104193 [WD Mich, No. 2:22-cv-226]). Instead, as stated in the "Report and Recommendation" from the federal magistrate judge reviewing the case, "Myerscough does not contend let alone establish otherwise. Instead, he moves for leave to amend his complaint to name as defendants the true and accurate perpetrators of the wrongdoing's against [him], seemingly conceding that the Court lacks jurisdiction over the United Methodist Church, or at the very least that the United Methodist Church is not a true and accurate perpetrator of the alleged wrongdoings against him" (Myerscough v United Methodist Church, 2023 WL 3998256, *2, 2023 US Dist LEXIS 104193, *5 [emphasis added; citation and internal quotation marks omitted]). Additionally, in Phillips v Eastern Pa. Conference (2000 WL 375262, 2000 US Dist LEXIS 4646 [ED Pa, No. CIV. A. 00-430]), the plaintiff commenced an action against, among others, the Eastern Pennsylvania Conference of the United Methodist Church, the Anna Shaw District, and United Methodist Church. In granting the defendants' motion to dismiss the complaint, the United States District Court for the Eastern District of Pennsylvania determined that "[a]s the Eastern Pennsylvania Conference encompasses both defendants United Methodist Church and the Anna Shaw District, the latter two entities are not separate jural entities subject to suit" (Phillips v Eastern Pa. Conference, 2000 WL 375262, *2, 2000 US Dist LEXIS 4646, *5). The court continued, noting that
"the Eastern Pennsylvania Conference is the governing body presiding over all United Methodist Churches in the eastern half of the Commonwealth of Pennsylvania, while the Anna Shaw District is but one of seven districts in the Eastern Pennsylvania Conference. [*9]Therefore, the United Methodist Church and the Anna Shaw District are not properly named defendants in this action and are hereby dismissed" (id.).
Applying this law to the facts in the record before us, we conclude that the defendants established that United Methodist Church, as testified to by Caterson, is a religious denomination with a single purpose—"to make disciples for Jesus Christ for the transformation of the world"—and not a jural entity amenable to suit as an unincorporated association. It is undisputed that United Methodist Church does not have a principal place of business, does not have its own offices or employees, and does not and cannot hold title to property, and there is no proof in the record that United Methodist Church has incorporated or held itself out as a jural entity in any other jurisdiction. Moreover, the defendants demonstrated at the hearing that United Methodist Church, as such, does not have any involvement in the staffing or the removal of clergy or staff at the local church level.
To the extent that the plaintiff argues that the United Methodist Church website establishes that United Methodist Church holds itself out as an entity, the record before this Court suggests otherwise. Although the terms of service highlighted by the plaintiff may have raised a question of fact warranting a hearing, the testimony from the hearing established, at best, that the website of United Methodist Church is published and maintained by the Board of Communications, an incorporated entity with specific responsibilities listed in the Discipline. Similarly, the Audit Report, which is not addressed to United Methodist Church, but rather to GCFA's Board of Directors and Committee on Audit and Review, simply provides insight into how GCFA allocates the donations from local churches and individuals to "the various dozen corporate entities that also serve the General Church."
Ultimately, then, the evidence in the record before this Court establishes that United Methodist Church does not operate as an entity separate and apart from those incorporated and unincorporated entities that comprise the United Methodist system. Instead, United Methodist Church governs itself through the efforts of United Methodists from all over the world who, at various levels, propose and adopt policies and procedures in the Discipline to be followed by, among others, local churches, annual conferences, and the various corporate entities at the general church level, such as GCFA. Given this unique structure, the hierarchical nature of United Methodist Church's "connectional" structure does not, in and of itself, suggest that United Methodist Church is an unincorporated association or anything other than a religious denomination.[FN5]
Critically, at the hearing, the Supreme Court only heard testimony from Caterson, who, although not qualified as an expert, testified about the nature of United Methodist Church based upon her many years as a member of a local Methodist church, as a member of the Judicial Council, and as a delegate to numerous General Conferences. Caterson unequivocally described United Methodist Church as "a bunch of separate corporations with responsibilities, each with its own board of trustees," and not a "holding company with subsidiaries." Caterson's testimony established that United Methodist Church has no separate existence apart from the incorporated and unincorporated entities that make up the United Methodist system (see Phillips v Eastern Pa. Conference, 2000 WL 375262, 2000 US Dist LEXIS 4646). Notably, although the plaintiff cross-examined Caterson at length, the plaintiff did not present his own expert witness on the jural nature of United Methodist Church.
Barr v United Methodist Church (90 Cal App 3d 259, 153 Cal Rptr 322), relied upon heavily by the plaintiff, is both distinguishable from this matter and based upon questionable reasoning. In Barr, the plaintiffs commenced a class action on behalf of approximately 1,950 present and former residents of certain retirement homes operated by Pacific Homes Corporation (hereinafter Pacific Homes). The plaintiffs commenced the action against the Pacific and Southwest Annual Conference of the United Methodist Church, GCFA, and United Methodist Church, and alleged that United Methodist Church was an unincorporated association and that Pacific Homes acted as an agent of United Methodist Church (see Barr v United Methodist Church, 90 Cal App 3d at 262-263, 153 Cal Rptr at 325). In determining that United Methodist Church was an unincorporated association capable of being sued, the California Court of Appeal applied a standard familiar to New York law—that United Methodist Church be considered "a group whose members share a common purpose"—but also applied a second factor, that United Methodist Church "function[s] under a common name under circumstances where fairness requires the group be recognized as a legal entity," where "[f]airness includes those situations where persons dealing with the association contend their legal rights have been violated" (Barr v United Methodist Church, 90 Cal App 3d at 266-267, 153 Cal Rptr at 328). This "fairness" factor does not appear in New York law, and thus, Barr is distinguishable from the instant matter.
Notably, the California Court of Appeal in Barr acknowledged that "[United Methodist Church] may be unique in that it has no single chief operating officer," but noted that "the clearly defined operating and conceptual levels of responsibility starting with the general conference . . . cannot be ignored" (Barr v United Methodist Church, 90 Cal App 3d at 268, 153 Cal Rptr at 329). To support this conclusion, the court noted that "a persuasive argument can be made that the Council of Bishops is equivalent to the board of directors of [United Methodist Church]," since, "[a]ccording to [the] Discipline, the 'Council of Bishops is thus the corporate expression of episcopal leadership in the Church' which is required 'to meet at stated intervals' in order to oversee 'the spiritual and temporal affairs of the whole church'" (id.). However, in this case, the plaintiff does not contend that the role of the Council of Bishops supports a finding that United Methodist Church is an unincorporated association, and no testimony on this point was elicited at the hearing. Moreover, we note that the quoted language concerning the Council of Bishops from 1979 no longer exists in the Discipline.[FN6]
The California Court of Appeal also concluded that "[t]he day to day operation of [United Methodist Church] is in keeping with the reality of its organization," noting that
"[i]n applying for a group exemption under section 501(c) of the Internal Revenue Code of 1954, GCFA described itself as 'the central treasury and fiscal agent of the United Methodist Church [that] has been established by the General Conference to act as its finance committee and accordingly its duties are legislated in [the] Discipline'" (Barr v United Methodist Church, 90 Cal App 3d at 269, 153 Cal Rptr at 329).
The court also noted that "[United Methodist Church] is a named insured on a high limit contract [*10]of insurance commencing June 1, 1976, to June 1, 1979, with a broad range of fidelity, casualty, property, fire, theft, medical malpractice and comprehensive general liability coverage," and is described by the policy as "a corporation engaged in business as a religious organization" (Barr v United Methodist Church, 90 Cal App 3d at 270, 153 Cal Rptr at 330). Again, however, the record before this Court contains no evidence concerning how GCFA holds itself out to governmental entities and whether United Methodist Church is listed on any current insurance policies as a corporation or otherwise, and the plaintiff does not contend that United Methodist Church has held itself out as an unincorporated association to the Internal Revenue Service or any other governmental or insurance agencies.
The California Court of Appeal also noted that in several cases "[United Methodist Church] has appeared as principal" (Barr v United Methodist Church, 90 Cal App 3d at 269, 153 Cal Rptr at 330). However, a review of those cases establishes that: (1) United Methodist Church itself was not the entity appearing in the litigation (see Goodson v Northside Bible Church, 261 F Supp 99, 100 [SD, Ala] [United Methodist Church not listed as a party to the action; decision indicates that "[t]he plaintiffs are representatives of The Methodist Church" (emphasis added)], affd 387 F2d 534 [5th Cir]; Carnes v Smith, 236 Ga 30, 31, 222 SE2d 322, 324 [although the decision refers to the plaintiff as "United Methodist Church," the proceeding at issue involved "an equitable petition . . . filed on behalf of The United Methodist Church by the Griffin district superintendent, the bishop, and others"]; Brady v Reiner, 157 W Va 10, 16, 198 SE2d 812, 817 [noting that "[f]or purpose of clarity, the appellees, who generally represent The United Methodist Church through the West Virginia Annual Conference and through the Fairmont District of that conference, may be referred to in this opinion as the general church"]); (2) United Methodist Church was a defendant and the issue of whether United Methodist Church was a jural entity was not litigated (see United Methodist Church v St. Louis Crossing Ind. Methodist Church, 150 Ind App 574, 276 NE2d 916); or (3) United Methodist Church was named as a plaintiff only because counsel to other Methodist plaintiffs decided, on his own, to include United Methodist Church as a party to the action (see Barr v United Methodist Church, 90 Cal App 3d at 270 n 9, 153 Cal Rptr at 330 n 9).
The California Court of Appeal also determined that the relationship between Pacific Homes and United Methodist Church required that United Methodist Church be recognized as a legal entity (see Barr v United Methodist Church, 90 Cal App 3d at 270, 153 Cal Rptr at 330). Despite noting that Pacific Homes was formed by an annual conference of United Methodist Church's predecessor, the Methodist Episcopal Church, and operated by the current Pacific and Southwest Annual Conference, the court noted that "the successful performance by Pacific Homes was pointed to with pride over a number of years in many public statements by the president of [United Methodist Church]'s Council of Bishops" (Barr v United Methodist Church, 90 Cal App 3d at 271, 153 Cal Rptr at 331). According to the court, since "[United Methodist Church], in fulfilling its commitment to society, has elected to involve itself in worldly activities by participating in many socially valuable projects," and thus, "enjoyed the benefits, both economic and spiritual, of those projects," United Methodist Church "must now, as part of its involvement in society, be amenable to suit" (Barr v United Methodist Church, 90 Cal App 3d at 272, 153 Cal Rptr at 331). However, the court appeared to wholly discount the fact that Pacific Homes was founded by the predecessor of the Pacific and Southwest Annual Conference and operated by the Pacific and Southwest Annual Conference, and was, like all United Methodist Church entities, subject to the provisions of the Discipline. In other words, contrary to the court's determination, United Methodist Church did not act as an unincorporated association to oversee or control Pacific Homes.
Thus, given the many questionable conclusions of the Barr court and the distinctly different evidence in the record before this Court, we conclude that Barr does not constitute persuasive authority on which to rely.
Since the defendants established that United Methodist Church is not a jural entity capable of being sued, the Supreme Court incorrectly determined that United Methodist Church exists and operates as an unincorporated association (see Myerscough v United Methodist Church, 2023 WL 3995847, 2023 US Dist LEXIS 103582; cf. Craine v NYSARC, Inc., 88 AD3d at 1106; RKJW1 Doe v Watchtower Bible & Tract Socy. of N.Y., Inc., 2023 NY Slip Op 34072[U], *1; Barr v United Methodist Church, 90 Cal App 3d 259, 153 Cal Rptr 322). Accordingly, the court should have granted that branch of the motion of United Methodist Church and the General Conference which was pursuant to CPLR 3211(a)(8) to dismiss the amended complaint insofar as asserted against United Methodist Church (see Honeyman v Curiosity Works, Inc., 120 AD3d at 1303; [*11]Holtzman v KTB Athletics SB TM, 113 AD3d at 656; Myerscough v United Methodist Church, 2023 WL 3995847, 2023 US Dist LEXIS 103582; Phillips v Eastern Pa. Conference, 2000 WL 375262, 2000 US Dist LEXIS 4646).
Whether the Action Was Timely Commenced Against GCFA
On appeal, the appellants contend that the amended complaint insofar as asserted against GCFA was untimely, since the amended complaint was filed on November 2, 2021, outside the statute of limitations provided for in CPLR 214-g. The appellants also contend that the relation-back doctrine is not applicable, since United Methodist Church and GCFA are not united in interest.
"[T]he general rule holds that an appellate court must apply the law as it exists at the time of its decision" (Deutsche Bank Natl. Trust Co. v Groder, 218 AD3d 542, 544 [internal quotation marks omitted]).
"CPLR 214-g, enacted as part of the CVA, provides a revival window for 'civil claims or causes of action alleging intentional or negligent acts or omissions that seek to recover for injuries suffered as a result of conduct which would constitute sex crimes, which conduct was committed against a child less than 18 years of age, for which the statute of limitations had already run'" (Bethea v Children's Vil., 225 AD3d 580, 581, quoting S.H. v Diocese of Brooklyn, 205 AD3d 180, 184; see Anonymous v Castagnola, 210 AD3d 940, 941).
The CVA became effective in August 2019, and "[o]n August 3, 2020, the CVA was amended so as to extend the revival window for one additional year, until August 14, 2021" (Bethea v Children's Vil., 225 AD3d at 581). After this appeal was fully briefed, this Court held that the revival window, originally set to expire on August 14, 2021, was tolled due to the COVID-19 pandemic "from August 14, 2021, until at least November 12, 2021" (id.). As the amended complaint naming GCFA as an additional defendant was filed on November 2, 2021, it was timely (see id.). Therefore, we need not reach the appellants' contentions concerning whether the relation-back doctrine is applicable to the facts of this case.
Accordingly, GCFA's motion pursuant to CPLR 3211(a) to dismiss the amended complaint insofar as asserted against it was properly denied, and we affirm so much of the order appealed from as denied GCFA's motion, albeit on a ground different from that relied upon by the Supreme Court.
The parties' remaining contentions need not be considered in light of our determinations.
Accordingly, the order is modified, on the law, by deleting the provision thereof denying that branch of the motion of United Methodist Church and the General Conference which was pursuant to CPLR 3211(a)(8) to dismiss the amended complaint insofar as asserted against United Methodist Church, and substituting therefor a provision granting that branch of the motion; as so modified, the order is affirmed insofar as appealed from.
DUFFY, J.P., WOOTEN and DOWLING, JJ., concur.
ORDERED that the order is modified, on the law, by deleting the provision thereof denying that branch of the motion of the defendants United Methodist Church and United Methodist Church General Conference which was pursuant to CPLR 3211(a)(8) to dismiss the amended complaint insofar as asserted against the defendant United Methodist Church, and substituting therefor a provision granting that branch of the motion; as so modified, the order is affirmed insofar as appealed from, without costs or disbursements.
ENTER:
Darrell M. Joseph
Clerk of the Court

Footnotes

Footnote 1:The full text of paragraph 141 of the Discipline states:
"¶ 141. The Church—Affirming the spiritual dimensions of the ministry of all Christians, as proclaimed in ¶¶ 120-143 of this Book of Discipline, it is recognized that this ministry exists in the secular world and that civil authorities may seek legal definition predicated on the nature of The United Methodist Church in seeking fulfillment of this ministry. Accordingly, it is appropriate that the meaning of 'The United Methodist Church,' 'the general Church,' 'the entire Church,' and 'the Church' as used in the Book of Discipline should now be stated consistently with the traditional self-understanding of United Methodists as to the meaning of these words.
"These terms refer to the overall denomination and connectional relation and identity of its many local churches, the various conferences and their respective councils, boards, and agencies, and other Church units, which collectively constitute the religious system known as United Methodism. Under the Constitution and disciplinary procedures set forth in this Book of Discipline, 'The United Methodist Church' as a denominational whole is not an entity, nor does it possess legal capacities and attributes. It does not and cannot hold title to property, nor does it have any officer, agent, employee, office, or location. Conferences, councils, boards, agencies, local churches, and other units bearing the name 'United Methodist' are, for the most part, legal entities capable of suing and being sued and possessed of legal capacities."

Footnote 2:At the same time, paragraph 2509(2) of the Discipline states that "[a]ny denominational unit authorized to hold title to property and to enforce trusts for the benefit of the denomination may bring suit in its own name to protect denominational interests" (emphasis added).

Footnote 3:Since the plaintiff has not cross-appealed from the order appealed from, the Supreme Court's determination that the General Conference is not a jural entity capable of being sued is not at issue on this appeal.

Footnote 4:In the order appealed from, the Supreme Court also determined, after the hearing, that the defendants established that service of process upon United Methodist Church and GCFA was not properly made. However, the court granted the plaintiff's application pursuant to CPLR 306-b to re-serve United Methodist Church and GCFA. Concerning service on United Methodist Church as an unincorporated association, the court acknowledged that United Methodist Church "has no individual president or treasurer." As such, the court noted that GCFA was United Methodist Church's "most appropriate representative" since GCFA was the entity within the United Methodist system that was most analogous to a "president or treasurer" (General Associations Law § 13).

Footnote 5:This case is distinguishable from RKJW1 Doe v Watchtower & Tract Socy. of N.Y., Inc. (2023 NY Slip Op 34072[U] [Sup Ct, Kings County]), relied upon by the plaintiff. In RKJW1 Doe, the plaintiff alleged that the defendant Governing Body of the Jehovah's Witnesses (hereinafter the Governing Body) "is a group of eight individuals, that decides all actions related to the operation of the hierarchical religious entity known as the Watchtower Bible and Tract Society of New York, Inc. ("Watchtower"), a duly incorporated religious entity" (id. at *2). The complaint alleged, among other things, that the Governing Body's principal headquarters was located in Kings County (see id. at *3). Further, the complaint alleged at the time of the alleged sexual abuse,
"the Governing Body established the sexual abuse policies implemented by Watchtower and all congregations of Jehovah's Witnesses in the United States; established the policies for appointing and supervising elders and ministerial servants within the Jehovah's Witness organization; participated in the appointment of elders and ministerial servants; and exercised supervision and control over elders and ministerial servants, including [the alleged perpetrator of sexual abuse]" (id. at *3).
Considering these allegations, the Supreme Court denied the Governing Body's motion to dismiss the complaint insofar as asserted against it.
In contrast, here, the evidence establishes that United Methodist Church has no employees, office, or headquarters, does not make decisions concerning the hiring and supervision of church employees in local churches, does not act as a central oversight authority for the United Methodist religious denomination, and does not have any existence separate and apart from its constituent parts.

Footnote 6:Instead, paragraph 422(2) of the Discipline now states that "[t]he Council of Bishops is thus the collegial expression of episcopal leadership in the Church and through the Church into the world" (emphasis added).